UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division
**Case Number:  08-20603-CIV-MARTINEZ-BROWN**

DR. KATHERINE MURPHY,
        Plaintiff,

vs.

CITY OF AVENTURA et. al.,
        Defendants.
_____/

### ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING WITHOUT PREJUDICE PLAINTIFF'S STATE LAW CLAIMS

THIS CAUSE came before the Court upon Defendants the City of Aventura, Aventura City of Excellence School, Eric Soroka, and Teresa Soroka's Motion for Summary Judgment (D.E. No. 120).  After careful consideration and for the reasons set forth below, the Court grants Defendants' motion for summary judgment on the federal claims asserted in Counts I and II of the Second Amended Complaint and dismisses without prejudice the remaining state law claims in the Second Amended Complaint.

### I.  Relevant Factual and Procedural Background

On April 1, 2003, Plaintiff Dr. Katherine Murphy began serving as the principal of the Aventura Charter Elementary School.  *See* (D.E. No. 130-2 at 2).  This case arises from Plaintiff Dr. Katherine Murphy's ("Plaintiff" or "Dr. Murphy") termination from her position as principal of the Aventura City of Excellence School on December 1, 2006, *see* (D.E. No. 115-16), and her allegations that she was subjected to unlawful sexual harassment by the City Manager of the City of Aventura, Eric Soroka.  She has filed a ten-count Second Amended Complaint against Defendants the City of Aventura ("the City"), Aventura City of Excellence School ("ACES"),

Charter Schools USA, Inc. ("CSUSA"), Charter Schools USA at Aventura, LLC ("CSUSAA"),

Eric Soroka, Nicole Monroe ("Monroe") and Teresa Soroka.[1]

In Counts I and II, Plaintiff alleges violations of Title VII of the Civil Rights Act of 1991,

42 U.S.C. § 2000e *et. seq.*  In Count I, asserted against the City, Plaintiff alleges that Eric Soroka,

the City Manager of the City of Aventura, sexually harassed her and that this harassment created

a hostile work environment. Plaintiff's allegations of sexual harassment are based on insulting

and vulgar language that her supervisor, Defendant Eric Soroka, either directed at her or stated in

front of her.

Plaintiff alleges that the following incidents occurred during her employment.[2]

1.     In April 2003, Dr. Murphy had a conversation with Bob Diamond, a city commissioner, about teaching some lessons at the school.  (D.E. No. 133-5 at 2).   She told Eric Soroka about this conversation and "he went ballistic."  *Id*.  He called her a "dumb shit" and told her that she couldn't have commissioners coming to the school.  *Id*. at 4.  He also told her that "[i]t's fucking inappropriate for you to talk to them."  *Id*.

2.     In April 2003, Dr. Murphy returned a phone call from Elaine Adler, the President of the Aventura Marketing Council.  *Id*. at 5-6.  Eric Soroka walked into her office and Dr. Murphy told him that she was holding for Elaine Adler.  *Id*. at 6.  Eric Soroka told Dr. Murphy to hang up the phone.  *Id*. He then told her that he didn't want her getting involved with Elaine Adler.  *Id*.  He also said to Dr. Murphy: "you're a stupid fuck. You can't get my message that you're not to do this?"  *Id*.

3.     In May 2003, Dr. Murphy spoke with Jay Beskin, a city commissioner.  *Id*. at 7.  Eric

_____

[1]Plaintiff also filed suit against Jonathan Hage and Elaine Adler.  However, the claims against Jonathan Hage and Elaine Adler were previously dismissed.  *See* (D.E. Nos. 81, 82).

[2]These are the same incidents that Plaintiff lists and discusses in her response.  The Court, however, has separated the incident described as incident thirteen in Plaintiff's list into two incidents, listed above as incidents thirteen and fourteen in accordance with Dr. Murphy's testimony in her deposition.  *See* (D.E. No. 136 at 10).   In addition, the "stupid bitch" comment is referenced only in a footnote in the response.  *Id*. at 10 n.1.

Soroka screamed and yelled at her and told her "[y]ou directors do not talk."[3]  He also called Dr. Murphy a "stupid shit" and a "dumb fuck."  *Id*. at 8.

4.    Eric Soroka would scream and yell at Dr. Murphy if an ACES parent had a complaint.  *Id*. at 18.

5.    Eric Soroka "would call her if there was an event at the school . . . and two commissioners were in the same building at the same time and call . . . her words like you slut, even you goddamn fuck-up and ask her, can't you get this?"  *Id*.

6.    Eric Soroka got angry with Dr. Murphy after she had a conversation with some parents about their concerns that they wanted more input into the School Advisory Board Meetings and the school.  *Id*. at 24.  He called her a "dumb fuck" and told her she should have dealt with the situation and not allowed it to him embarrass him.  *Id*.

7.    Eric Soroka would often speak with Dr. Murphy before School Advisory Board meetings.  *Id*. at 26.  When he walked in Dr. Murphy could tell whether "it was going to be good or bad."  *Id*. If it was bad, he would say things to Dr. Murphy like: "you dumb shit, you stupid fuck, you fucked up, how come you can't do this, why can't you control staff, an idiot could take care of this, . . . you have the mindlessness of a hooker."  *Id*.

8.    After a meeting where all of the commissioners were present, Dr. Murphy and her husband sat down at a restaurant in Aventura.  *Id*. at 32.  All of the commissioners except one also showed up at the restaurant.  *Id*. Dr. Murphy was scared to be at the restaurant with the commissioners so she eventually left.  *Id*.  Either the next day or a few days later, Eric Soroka called Dr. Murphy on the phone around 10 p.m. at night while she was in Key West with her husband.  Eric Soroka screamed obscenities at her about not learning her lesson.  *Id*.  He told her he was going to fire her and that she was a "dumb shit."  *Id*.  He asked her why she attended a dinner with the commissioners, and she told him that she didn't go to dinner with them.  *Id*. at 33.  He told her that he was going to investigate the incident and get back to her, and if her actions were deliberate, than she "was fucked."  *Id*.

9.    Eric Soroka once called Dr. Murphy and told her that she and Luz Weinberg, a city commissioner in the midst of her second divorce, looked like they were hookers because they were out alone together.  *Id*. at 35-36.[4]

_____

    [3]It appears that what Dr. Murphy meant to say is that Eric Soroka told her not to talk to directors.  *See* (D.E. No. 136 at 9).

    [4]In the response, Plaintiff states "on many occasions Eric Soroka directed humiliating comments at Dr. Murphy such as "you look like a hooker," which occurred after she was seen out to dinner with city commissioner Luz Weinberg."  (D.E. No. 136 at 9).  In her deposition, however, with regard to this incident Plaintiff refers to one specific time that Eric Soroka called

10.     Eric Soroka called Dr. Murphy and told her that her dining out alone made her look like a "whore."  *Id*. at 65-66.

11.     Eric Soroka called Dr. Murphy after he heard that she was out to dinner with Luz Weinberg a second time and told Dr. Murphy that she looked like a "whore to be with her, because . . . [Ms. Weinburg] looks like a slut as well, out when she's working on her second divorce."  *Id*. at 67.

12.     In 2005, Eric Soroka called Dr. Murphy a "goddamn slut" after he read an article about Dr. Murphy in the newspaper that he stated he did not authorize.  *Id*. at 69.

13.     Eric Soroka ridiculed Dr. Murphy and used vulgar language when she attended "Daniel's Walk," a walk for a child that was killed in a bomb explosion in Israel, where city commissioners and the mayor were present.  *Id*. at 70.

14.     Eric Soroka ridiculed Dr. Murphy and used vulgar language when she attended a cystic fibrosis walk where city commissioners and the mayor were present.  *Id*. at 70-71.

15.     In the Spring of 2006, while Dr. Murphy was in a parent teacher conference, Eric Soroka called her and stated over the phone "you stupid shit . . .you slut, how can you do this? . . .  Don't you goddamn learn your lessons."  *Id*. at 72.

16.     In the Summer of 2006, Eric Soroka called Dr. Murphy a "goddamn stupid fuck" after Dr. Murphy advised Eric Soroka that his wife, the city clerk, could not remove students' records from the school because it would violate privacy laws.  *Id*. at 74-75.

17.     In June or July of 2003, Eric Soroka came to the school for uniform day.  *Id*. at 8-9. There was a ten-year-old girl there who wore a very large size bra.  *Id*. at 9.  Her mother commented that her daughter would not be able to fit into the uniform, and as an aside to Dr. Murphy, Eric Soroka stated "[w]ouldn't all women love to have that problem."  *Id*.

18.     Eric Soroka called Dr. Murphy a "stupid bitch."  *Id*. at 68.[5]

        In Count II, also asserted against the City, Plaintiff alleges that she was fired from her

position as principal in retaliation for opposing Eric Soroka's unwelcome sexual harassment in

---

her and said that she and Luz Weinberg looked like a hooker because they were out alone together.  *Id.* at 35-36.

        [5]In her deposition, Dr. Murphy does not give any context for this comment.  Thus, it is unclear why the comment was made, where it was made, or when it was made.

violation of Title VII.  In Plaintiff's remaining eight counts, she asserts various state law claims against the different Defendants.[6]

All Defendants have moved for summary judgment in this case.[7]  The Court, however, finds it is only necessary to consider Defendants the City, ACES, Eric Soroka, and Teresa Soroka's Motion for Summary Judgment (D.E. No. 120) with respect to the federal claims in Counts I and II.  Because the Court grants summary judgment on Plaintiff's federal claims, the Court also *sua sponte* dismisses Plaintiff's state claims.

## II. Analysis

### A.     Federal Claims

The Court finds that the Defendant City is entitled to summary judgment on the federal claims asserted against it in Counts I and II.  A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

---

[6]In Count III, Plaintiff alleges a claim of defamation and slander per se against Defendants the City, Eric Soroka, Monroe, CSUSA, and CSUSAA.  In Count IV, Plaintiff alleges a breach of contract claim against CSUSA and CSUSAA.  In Count V, Plaintiff alleges a claim for conversion against the City and Eric Soroka.  In Count VI, Plaintiff alleges a claim for intentional interference with a business relationship against Eric Soroka, Monroe, CSUSA, and CSUSAA.  In Count VII, Plaintiff alleges a claim for conspiracy to intentionally interfere with business relations against Eric Soroka, Monroe, CSUSA, and CSUSAA.  Count VIII is a claim for a permanent injunction asserted against the City, Eric Soroka, Monroe, CSUSA, and CSUSAA.  In Count IX, Plaintiff alleges a claim for conspiracy to defame against the City, Eric Soroka, Teresa Soroka, Monroe, CSUSA, and CSUSAA.  In Count X, Plaintiff alleges a claim for declaratory judgment against ACES.

[7]Defendants CSUSA, CSUSAA, and Nicole Monroe have moved for partial summary judgment.  *See* (D.E. No. 111).  Only state law claims are asserted against these Defendants.  As set forth below, the Court dismisses these claims; therefore, it is unnecessary for the Court to consider the motion for summary judgment as to these claims.

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  By its very terms, this standard provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Anderson*, 477 U.S. at 248;  *Matsushita Electric Indus. Co.,* 475 U.S. at 586.  It is "material" if it might affect the outcome of the case under the governing law. *Anderson*, 477 U.S. at 248.  In addition, in considering a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party. *Id*. at 255.

If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment. *See United States v. Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F. 2d 1428, 1438 (11th Cir. 1991).  The moving party  "'must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial.'" *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)).  "If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Four Parcels of Real Prop. in Greene and Tuscaloosa Counties*, 941 F. 3d at 1438 (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.3d 1472, 1477 (11th Cir. 1991)). *See also* Fed. R. Civ. P. 56(e).

In contrast, if the non-moving party bears the burden of proof at trial, the moving party may obtain summary judgment simply by establishing the nonexistence of a genuine issue of material fact as to any essential element of a non-moving party's claim or affirmative defense. *Celotex*, 477 U.S. at 324. When the non-moving party bears the burden of proof, the moving party does not have to "support its motion with affidavits or other similar material *negating* the opponent's claim." *Id*. at 323 (emphasis in original). The moving party may discharge its burden in this situation by showing the Court that "there is an absence of evidence to support the nonmoving party's case." *Id*. at 324.  Once the moving party discharges its initial burden, a non-moving party who bears the burden of proof must "go beyond the pleadings and by [its] own affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting Fed. R. Civ. P. 56(e)). A non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

In Counts I and II, Plaintiff alleges violations of Title VII, which prohibits employment discrimination on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Specifically, Title VII states that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *Id*.  Title VII protects against "the entire spectrum of disparate treatment of men and women" including sexual harassment. *Meritor Savs. Bank, FSB v. Vinson*, 477 U.S. 57, 64-67 (1986).  Title VII also prohibits an employer from

-7-

retaliating against an employee for making a sexual harassment complaint under Title VII.  Here, Plaintiff has alleged that the City violated Title VII by creating a hostile work environment and by unlawfully retaliating against her for engaging in activity protected under Title VII.  After careful consideration, the Court finds no genuine issues of material fact remain as to these claims.

### 1.     Count I:  Hostile Work Environment

First, Defendant has moved for summary judgment as to Plaintiff's claim in Count I that she was subjected to a hostile work environment.  "A hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Miller v. Kenworth of Dothan, Inc*., 277 F. 3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21 (1993)). The Eleventh Circuit has held that to support a hostile work environment claim, a plaintiff must demonstrate the following elements:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc*., 195 F. 3d 1238, 1245 (11th Cir. 1999).  The City argues that Plaintiff cannot demonstrate a hostile work environment claim because she cannot show that a number of the alleged incidents were based on her sex as required under the third element and because she cannot show that the alleged harassment was sufficiently severe or pervasive as required by the fourth element. This Court agrees.

With regard to the third element, the Eleventh Circuit has stated "[a]n equal opportunity curser does not violate a statute whose concern is, as the Supreme Court has phrased it, 'whether members of one sex are exposed to disadvantageous terms or conditions of employment which members of the other sex are not exposed.'" *Baldwin v. Blue Cross/Blue Shield of Ala*., 480 F. 3d 1287, 1302 (11th Cir. 2007) (quoting *Onacle v. Sundowner Offshore Servs., Inc*. 523 U.S. 75, 80 (1998)). "Another way to put it , as the Supreme Court has, is that the statute does not enact 'a general civility code.'" *Id*. (quoting *Onacle*, 523 U.S. at 81).

Plaintiff has testified to eighteen specific comments made by Defendant Eric Soroka. Many of the comments about which Plaintiff complains, however, relate to Defendant Eric Soroka's general use of profanity and vulgar language. Plaintiff has offered no evidence that Defendant Eric Soroka singled out females as the targets for his offensive language. On the contrary, in her deposition Plaintiff testified that although she never heard him speak in this offensive manner to anyone else, Human Resources Director Judy Applegren indicated to her that he routinely spoke this way to others and that he didn't mean anything by his offensive language. *See* (D.E. No. 133-5 at 12-13). Plaintiff has also submitted the deposition of Ginger Kumnick, a CSUSA employee, in which Kumnick states that at a meeting with Defendant Eric Soroka he was upset with her and another CSUSA employee, Brad Hacker, for the alleged mismanagement of the 401K fund. (D.E. No. 136-2 at 9). At this meeting, Eric Soroka used foul and aggressive language with both her and Brad Hacker, specifically she stated he used the "F word" and asked them "how could this shit happen." *Id*. Thus, the Court finds that Plaintiff has failed to demonstrate that Defendant Eric Soroka's more general comments were sexual harassment.

Some of Eric Soroka's alleged comments, however, were sex specific, "which is to say

more degrading to women than men." *Baldwin*, 480 F.3d at 1302.  For example, Plaintiff has testified that Defendant Eric Soroka told her that she looked like a "hooker" and that she looked like a "whore."  Plaintiff also testified that he called her a "slut" and that he once stated in reference to a child who had large breasts that all women would like to have that "problem."  Such sex specific language does satisfy the third "based upon" element.  *See Reeves v. C.H. Robinson*, 525 F. 3d 1139, 1144 (11th Cir. 2008).

The City, however, also argues that Plaintiff cannot satisfy the fourth element, which requires the harassment be severe or pervasive. Determining whether harassing conduct is "sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and objective component." *Mendoza*, 195 F. 3d at 1246.  "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." *Id*. (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Viewing the facts in the light most favorable to Plaintiff, she subjectively perceived the alleged harassment to be so severe or pervasive to alter a term or condition of her employment.  *See Smith v. Norwest Fin. Acceptance, Inc.*, 129 F. 3d 1408, 1413 (10th Cir. 1998) (finding that the fact that plaintiff was humiliated and upset by her supervisor's hostile remarks satisfied the subjective component).  The Court, however, finds that no genuine issues of material fact remain that such perception was not objectively reasonable.

In assessing whether the alleged harassment objectively altered an employee's terms or conditions of employment, the court considers a number of factors.  These factors include: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically

threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct

unreasonably interferes with the employee's job performance." *Mendoza*, 195 F. 3d at 1246. The

Court considers each of these factors but acknowledges that these factors should not be viewed in

isolation but under the totality of the circumstances to determine if the harassment is actionable.

*Id*.

First, the Court considers the frequency of the conduct. There are nine specific incidents

in which Plaintiff alleges that Eric Soroka used sex specific language rather than just generalized

profanity and insults. Thus, Plaintiff alleges that Eric Soroka made nine comments[8] over two

---

[8]Plaintiff states in her response that before her School Advisory Board meetings Eric
Soroka "would continually direct abusive language at her, making comments such as, you stupid
shit, you stupid fuck, you fucked up, How come you can't do this , why can't you control your
staff, an idiot could take care of this, you have the mindlessness of a hooker." (D.E. No. 136 at
9-10). The Court has considered this comment as one incident where a sex specific comment
was directed at Plaintiff because of Eric Soroka's use of the phrase "mindlessness of a hooker."
The Court finds this in construing the facts in the light most favorable to Plaintiff, although
Plaintiff testified that she took this phrase simply to mean that she "had no brains." (D.E. No.
133-5 at 27).

The Court does not consider this as more than one incident because it is not clear that
before every School Advisory Board meeting, Eric Soroka actually directed a sex specific
comment at Plaintiff. For the most part, the specific comments Plaintiff relates were general
profane statements. In addition, Plaintiff testified that Eric Soroka didn't always use profanity
before these meetings. She testified that she could tell whether it would be "good or bad" when
he walked in the room, indicating that he wasn't always angry and that on his "good" days he
would not feel the need to use profanity. *See id*. at 26. Thus, because Plaintiff, who has the
burden to present specific facts, *see* Fed. R. Civ. P. 56(e), has not offered any evidence as to the
exact number of incidents before the School Advisory Board meetings which involved sex
specific comments, the Court has considered the described incident as one incident.

In addition, Dr. Murphy testified that Eric Soroka would call her

if two commissioners were in the same building at the same time . . .he would call
. . . [her] words like "you slut," even, you goddamn fuck-up. Can't you get this?"
And . . . [she] didn't invite these commissioners in the school. And so he called
one of the commissioners on the phone and told him to get the heck out of the
school, because it violated Sunshine law."

-11-

years and eight months.  Because the incidents occurred with such limited frequency, this factor

weighs against Plaintiff.  *See Dar Dar v. Associated Outdoor Club, Inc.*, 248 Fed. Appx. 82, 85-

86 (11th Cir. 2007) (finding that two inappropriate comments and two intentional buttocks

touchings over the course of twenty-two months did not establish that a plaintiff was subjected to

a hostile work environment).

The Court acknowledges that Plaintiff also stated in her deposition that Defendant Eric

Soroka used profanity "a lot."  *See* (D.E. No. 133-5 at 8).  However, as previously discussed, the

fact that Defendant Eric Soroka often used profanity is not enough to demonstrate that Plaintiff

was frequently sexually harassed.  Moreover, this statement is conclusory and not specific enough

to create a genuine issue of material fact.  *See Leigh v. Warner Bros., Inc*., 212 F.3d 1210, 1217

(11th Cir.2000) (finding that "conclusory allegations without specific supporting facts have no

probative value" and noting that a party resisting "summary judgment must meet the movant's

affidavits with opposing affidavits setting forth specific facts to show why there is an issue for

trial.") (internal quotation marks deleted).

In addition, in her deposition Plaintiff was asked by defense counsel if she remembered

any other incidents where Defendant Eric Soroka used the word "whore" other than the two

incidents detailed above, relating to her eating out by herself or with a city commissioner who was

in the middle of her second divorce.  (D.E. No. 133-5 at 68).  She stated that she could not

---

(D.E. No. 133-5 at 18).  It is unclear form this testimony whether Dr. Murphy is attempting to
refer to numerous occasions or a specific event.  However, as with the previous comment, the
Court has considered this as one event.  Even if this occurred more than one time, it is not clear
that Eric Soroka used a sex specific term like "slut" each and every time he called Plaintiff
regarding the commissioners.  It is unclear from her testimony how often this happened.  As
previously stated, it is Plaintiff's burden to present such specific facts.

remember any other incidents.  *Id.*  She was then asked to make sure and let defense counsel know if she remembered something else.  *Id.*  Plaintiff then responded that "it was pervasive.  It was all the time."  *Id.*  Plaintiff was then asked again if she could only remember the two instances described above where the specific word "whore" was used ,and she affirmed that that was all she could recall.  *Id.*  It is unclear if Plaintiff was attempting to state that Defendant Eric Soroka's use of the word "whore" was pervasive, or if she was simply stating again that his use of profane and vulgar language was pervasive.  Whichever way this "pervasive" statement is interpreted, it is simply too conclusory to provide the specific facts needed to defeat summary judgment.  *See Leigh*, 212 F.3d at 1217. This is especially true where Plaintiff admits that she can only specifically recall two incidents where the word "whore" was used.[9]  Defendant has met its burden in moving for summary judgment by showing that there is an absence of evidence to support Plaintiff's case, it is Plaintiff's burden to come forward with specific facts to defeat summary judgment.

---

[9]In addition, Plaintiff in her response to the motion for summary judgment highlights the testimony of Dawn McMillan, an ACES teacher, David McNamara, an ACES computer support technician, and Ginger Kumnick, a CSUSA employee.  However, upon review of this testimony, it does not create a genuine issue of material as to whether Dr. Murphy was frequently subjected to sexually harassing comments.

First, Dawn McMillan testified that she heard Defendant Eric Soroka on the phone with Dr. Murphy and that he used profanity, and in particular, he used the "f-word."  (D.E. No. 136-2 at 2). However, this again only establishes Eric Soroka's general use of profanity. It is unclear why David McNamara's testimony has been referred to by Plaintiff as he only states in his deposition that he was aware of a couple of incidents where Dr. Murphy emerged from a meeting with Defendant Eric Soroka looking upset.  (D.E. No. 136-2 at 4-6).  He specifically states that he never heard what was said in these meetings. *Id.* at 5-7.  Finally, Ginger Kimnick's testimony, like Dawn McMillan's again only establishes Eric Soroka's general use of profanity.  Ms. Kimnick states that she heard him use foul language with Dr. Murphy in a phone call, and that in a meeting, he used foul language and particularly the "F-word" directed towards herself and her colleague, Brad Hacker.  *Id.* at 9.

Next, the Court also finds that the severity factor weighs against Plaintiff.  As stated above, Plaintiff has alleged only nine comments that could be regarded as sex specific made by Defendant Eric Soroka over a period of two years and eight months.  Eight of these comments were directed at Plaintiff.  Specifically, Eric Soroka (1) called Plaintiff a slut when two city commissioners attended an event at the school; (2) told Plaintiff she had the "mindlessness of a hooker"; (3) told Plaintiff that she looked like a hooker when she went out to dinner alone with another woman, Luz Weinberg; (4) told Plaintiff that when she went to dinner alone she looked like a whore; (5) told Plaintiff that she looked like a whore when she went to dinner with Luz Weinberg, who he said looked like a slut because she was in the middle of her second divorce; (6) called Plaintiff a "goddamn slut" after he read an article about her, which he did not authorize; (7) called Plaintiff a slut over the telephone when he learned that she was talking to parents about raising money for teachers; and (8) in an unspecified situation, he called Plaintiff a bitch.  The final sex specific comment Eric Soroka is alleged to have made to Plaintiff occurred after a child could not fit into her uniform because of her breast size and Eric Soroka stated that every woman would like to have that problem.

After careful consideration, the Court finds the alleged conduct lacks severity. Courts have rejected sexual harassment claims that are as serious or more serious that the conduct at issue in this case. *See Mendoza*, 195 F. 3d 1238 at 1247-8, 1249 (finding that "one instance in which Page[, the alleged harasser,] said to [Plaintiff] Mendoza, 'I'm getting fired up;' (2) one occasion in which Page rubbed his hip against Menoza's hip while touching her shoulder and smiling; (3) two instances in which Page made a sniffing sound while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and (4) Page's 'constant' following and

staring at Mendoza in a 'very obvious fashion'" insufficient to support a hostile work environment claim); *Adusumilli v. City of Chicago*, 164 F. 3d 353, 357, 361-62 (7th Cir. 1998) (finding that harassment was not severe where over a two year and nine month period co-workers teased plaintiff about the way she ate a banana, told plaintiff to make sure she washed the banana before she ate it, made sexual jokes about rubber bands, told plaintiff not to wave at squad cars because people would think she was a prostitute, asked another female whether she wore a low-neck top last night, on two occasions stared at plaintiff's breasts, touched plaintiff's left arm between the elbow and shoulder, poked plaintiff's fingers, and poked plaintiff's butt); *Sprague v. Thorn Americas, Inc.*, 129 F. 3d 1355, 1365-66 (10th Cir. 1997) (finding five incidents which occurred over the course of sixteen months were not sufficiently severe or pervasive where the harassing conduct consisted of the harasser asking plaintiff to undo her top button, the harasser telling an unknown person that he couldn't call the women in the office girls and had to call them ladies, the harasser discussing how women are when they have PMS, the harasser interjecting himself into a conversation about what to call "neck chains" and stating that "neck chains" sounded kinky, and the harasser putting his arm around plaintiff at her wedding reception and looking down her dress, stating "well, you got to get it when you can.").

There are no allegations that Plaintiff was touched by Defendant Eric Soroka. Defendant Eric Soroka's alleged comments consist of: (1) five insulting remarks employing different derogatory terms for women such as "slut" or "hooker" used to convey his thoughts that Plaintiff was unintelligent where he apparently perceived Plaintiff as having made a mistake in her job; (2) three uses of insulting terms such as "hooker" and "whore," relating to Plaintiff's activities outside the office when expressing some sort of antiquated idea about women eating out alone and

women who get a divorce; and, (3) one off-hand comment relating to a child's failure to fit into her uniform because of her breast size and his belief that all women would like to have this problem. While Defendant Eric Soroka's alleged conduct is certainly inappropriate, unprofessional, and immature, these nine comments over a period of two years and eight months are not severe.

The Court next considers the third factor, whether the alleged conduct was physically threatening or humiliating. Nothing occurred in this case which was physically threatening.  Thus, the Court must consider whether the comments were humiliating.  Five of these comments are arguable humiliating because Plaintiff's boss was essentially screaming insults at her when she allegedly made a mistake.  The Court does note, however, that the humiliation does not stem as much from the sex-based nature of the insults as it does from the fact that she was being reprimanded and insulted by her boss in an unprofessional manner.

In addition, the Court does not find that Defendant Eric Soroka's strange comments regarding Plaintiff eating out alone or eating out with a divorced woman are particularly humiliating.  If anything, these comments are offensive utterances that betray a certain antiquated or immature mind-set of the speaker. Finally, the Court finds Eric Soroka's off-hand comment to the effect that all women wish they had that problem was not directed at Plaintiff and is nothing more than an offensive utterance.  Nonetheless, because the five insulting reprimands discussed above are arguably humiliating, the Court finds that this factor would weigh at least slightly in favor of Plaintiff.

Finally, the Court considers whether Defendant Eric Soroka's comments unreasonably interfered with Plaintiff's work performance.  Plaintiff has argued in her response that her job

-16-

performance was affected by Eric Soroka's comments because (1) "she was afraid to speak to any of the commissioners and the Mayor, who were members of the governing board of the school, responsible for overseeing the school"; (2) "she was admitted to Aventura Hospital because of work related stress in or around 2003-2004"; (3) she "suffered nightmares, depression and anxiety as a result of Defendant's actions"; (4) she asked Eric Soroka on more than one occasion not to use offensive language with her because she had work to do such as attending a meeting or reading the morning announcements. (D.E. No. 136) (internal quotations omitted).  However, the Court finds that these arguments are either not supported by the record or they do not demonstrate an interference with Plaintiff's work performance.

 With regard to her first argument, there is no evidence that part of her job was to speak with the commissioners or the Mayor.  Plaintiff also argues that she was admitted to Aventura Hospital because of work related stress; however, in her deposition, she testified only that she was admitted to Aventura Hospital for what was later determined to be stress.(D.E. No. 133-5 at 45). She does not testify that the stress was caused by Eric Soroka's comments, and she specifically stated that she did not tell any of the doctors or nurses that the way in which Eric Soroka treated her at work had anything to do with her condition.  *Id*. Plaintiff's third argument was that she suffered nightmares, depression, and anxiety as a result of Defendant's actions; however,  testified that these occurred in January 2007, after she had been fired from her position as principal.  *Id*. at 54-56.

 Finally, Plaintiff argues that she repeatedly told Eric Soroka to not use his offensive language with her because she needed to attend to a school task.  It appears that Plaintiff is trying to analogize to the situation in *Reeves v. C.H. Robinson Worldwide, Inc*. where the Eleventh

Circuit found that the alleged harassment had interfered with the plaintiff's job performance because "[s]he often took time away from her work to complain to her superiors, ask her co-workers to stop, or write notes to herself so she would have a record of some of the more offensive incidents."  525 F. 3d 1139, 1147 (11th Cir. 2008). However, *Reeves* is distinguishable as the harassment at issue in that case was much more frequent, occurring every day from the summer of 2001 until the spring of 2004.  *Id*. at 1141.  Reeves spent significant time away from her job, complaining about the incidents and reporting the incidents to supervisors.  *Id*. at 1147.  Here, the incidents at issue are nine different comments over two years and eight months.  There is no evidence that Plaintiff spent significant time away from her job complaining about these incidents.  Moreover, although Plaintiff does testify that Eric Soroka's comments upset her, there is no evidence that the comments actually interfered with her job performance or that it was the specific sex-based comments which upset her or Eric Soroka's general use of profanity or his general unprofessional manner. Thus, the Court finds this factor weighs against Plaintiff.

Considering the totality of the circumstances and all of the factors, the Court finds that the conduct at issues in this case was not sufficiently severe or pervasive to alter the terms and conditions of Plaintiff's employment and to create a discriminatorily abusive environment.  Three of the four factors weigh against Plaintiff and the Court particularly notes that the conduct was neither severe nor pervasive.  Thus, taking the evidence in the record in the light most favorable to Plaintiff, Eric Soroka's comments were certainly inappropriate, unprofessional, immature, and indicative of a reprehensible leadership style, but they are not sexual harassment sufficient to

create a hostile work environment.[10]  Thus, the Court grants summary judgment as to Count I.

### 2.    Count II:  Retaliation

Defendant also moves for summary judgment on Plaintiff's retaliation claim. Title VII makes it unlawful for an employer to retaliate against an individual because the individual "opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). "[A] plaintiff can prove a case of retaliatory treatment by providing direct evidence of retaliatory action, such as statements made by the decisionmaker to the effect that the plaintiff should suffer an adverse job action because she opposed discrimination [or harassment]." *Bevill v. UAB Walker College*, 62 F. Supp. 2d 1259, 1272 (N.D. Ala. 1999).  "A plaintiff can also demonstrate that her employer retaliated against her for engaging in a protected activity through the use of circumstantial evidence." *Id.* Here, plaintiff's claims are based upon circumstantial evidence, and the burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) applies.

Under this framework, the plaintiff must first demonstrate a prima facie case for retaliation.  To do this, a "plaintiff must show: 1) a statutorily protected expression; 2) an adverse employment action;[11] [and] 3) a causal link between the protected expression and the adverse action." *Sullivan v. Nat'l Railroad Passenger Corp.*, 170 F. 3d 1056, 1059 (11th Cir. 1999).  If the plaintiff demonstrates a prima facie case, there is a presumption of retaliation.  *Id.*  The burden

---

[10]Although the Court finds this was not sexual harassment sufficient to create a hostile work environment, if these facts are true, the Court is concerned that a city government would employ a leader who would treat subordinates in such a reprehensible manner.

[11]This requires a showing that the action was materially adverse to a reasonable employee.  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-69 (2006).

then shifts to the defendant to rebut this presumption by producing legitimate nondiscriminatory reasons for the adverse employment action. *Id.*  "If the defendant offers legitimate reasons, the presumption of retaliation disappears."  *Id.*  Then the plaintiff must demonstrate that the defendant's "proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct."  *Id.*

Defendant moves for summary judgment, arguing that Plaintiff cannot demonstrate the first element of her prima facie case, namely that there was a statutorily protected expression, and that there was a legitimate, non-discriminatory reason for her termination.[12]  After careful consideration, the Court finds that there are no genuine issues of material fact that Plaintiff did not engage in protected activity, and because Plaintiff cannot demonstrate her prima facie case, the Court declines to move further in the *McDonnell Douglas* burden-shifting analysis.

First, Defendant argues that Plaintiff cannot demonstrate that she engaged in statutorily protected expression because she never complained that Eric Soroka sexually harassed her. "[T]he employee must, at the very least, communicate her belief that discrimination is occurring to the employer.  It is not enough for the employee merely to complain about a certain policy or certain behavior of co-workers and rely on the employer to infer that discrimination has occurred." *Webb v. R & B Holding Co., Inc.*, 992 F. Supp. 1382, 1389 (S.D. Fla. 1998).  In this case, it is undisputed that Plaintiff never filed a formal written complaint before her termination with regard to the alleged sexual harassment.  Plaintiff, however, references her deposition and argues in her response that she complained to Jonathan Hage, Luz Weinberg, Judy Appelgren, and Eric Soroka.

---

[12]Defendant in its reply brief also argues that there is no causal connection.  The Court does not address this argument as it was inappropriately raised for the first time in the reply brief.

*See* (D.E. No. 136 at 16).  The Court, finds however, that these alleged "complaints" do not demonstrate that Plaintiff engaged in protected activity.

Plaintiff testified that she complained to her "former boss" Jonathan Hage.  (D.E. No. 133-5 at 34).  Hage, however, as Plaintiff states was her *former* boss at this time, and as Plaintiff alleges in her complaint, the CEO of CSUSA and the manager of CSUSAA, two private entities with whom the city had a contract.  *See* (D.E. No. 20 at 3); *see also* (D.E. No. 115-6) (listing the organizational chart of the City and not listing CSUSA and CSUSAA as a part of the City).  Any complaint made to Hage was not a complaint to her employer, the City, and thus, such a complaint was not sufficient to demonstrate that Plaintiff engaged in protected activity.

 Plaintiff also alleges that she complained to Luz Weinberg, a city commissioner, Judy Appelgren, who at one point was the Human Resources Director for the City, and Eric Soroka. However, with regard to her complaints to Weinberg and Appelgren, she acknowledges that she never characterized Eric Soroka's conduct as having been sexually hostile or sexually harassing. (D.E. No. 133-5 at 50, 51).  Instead, Plaintiff testified that she complained that Eric Soroka used inappropriate, vulgar, and bullying language and that he would often yell and scream.  *Id*.[13] Plaintiff testified that she told Eric Soroka to "stop talking to . . . [her] that way, stop bullying . . . [her], [and] stop harassing . . . [her] staff."  (D.E. No. 133-5 at 40).  She also told Eric Soroka that his behavior was inappropriate and she asked him to please not use "that language" with her.  *Id*. at 41.  In addition, with regard to the comment Eric Soroka made regarding the girl who was

---

[13]Although not mentioned in her response, Plaintiff also states in her deposition that she told Elaine Adler about Eric Soroka's "behavior." (D.E. No. 133-5 at 51)  It appears that again Plaintiff just told Adler that Eric Soroka used vulgar and inappropriate language towards her; however, her use of the word "behavior" is conclusory and vague and not sufficient to create a genuine issue of material fact.

having trouble fitting into her uniform, Plaintiff testified that she stated something to the effect of "how would he like it if some man leered at his young daughter." *Id.*

These complaints, however, were not sufficient to notify her employer that she believed that Eric Soroka was sexually harassing her and thus, these complaints do not constitute protected activity. *See, e.g., Higgins v. New Balance Athletic Shoe, Inc.,* 194 F. 3d 252, 262 (1st Cir. 1999) *(*finding that plaintiff never alleged in his complaints that the conduct at issue violated Title VII or any other law and thus could not be considered protected activity); *Cordero v. Florida,* No. 4:06cv529-SPM/AK, 2007 WL 2972988, at *5 (N.D. Fla. Oct. 9, 2007) (finding that plaintiff's general complaints were not sufficient to put his employer on notice that he believed his supervisor was discriminating against him due to his disability); *EEOC v. Shoney's, Inc.,* 536 F.Supp. 875, 877 (N.D.Ala.1982) (where the EEOC brought suit on behalf of a male employee terminated by Defendant, the Court found that the male employee's "very generalized complaints . . .that he was not being treated fairly in that other managers could date waitresses who worked at the restaurant" did not put Defendant "on notice that he was protesting an illegal employment practice."). Plaintiff's complaints merely establish that Eric Soroka often used profane language but they do not indicate that Plaintiff believed she was being sexually harassed by Eric Soroka.[14] Thus, these "complaints" were not protected activity, and Plaintiff cannot demonstrate a prima facie case for retaliation.

---

[14]With regard to Plaintiff's complaints made to Hage, at one point she states in her deposition that she told Hage that Eric Soroka sexually harassed her, but later appears to clarify that she only told Hage that Eric Soroka used inappropriate and vulgar language with her. *See* (D.E. No. 133-5 at 34, 50). Thus, for the same reason that the general complaints to Weinburg, Applegren, and Eric Soroka were not sufficient, the general complaints to Hage, even if he was an employee, were also insufficient.

Although this reason alone would suffice to grant summary judgment, the Court finds that there is a second, alternate ground on which to find Plaintiff did not engage in statutorily protected activity.  The Court agrees, as Defendant argues, that Plaintiff cannot demonstrate that she engaged in statutorily protected expression because she cannot demonstrate that it was objectively reasonable for her to believe that she was subjected to a hostile work environment. "To establish that a plaintiff engaged in statutorily protected expression, we have held that a plaintiff must show that she 'had a good faith, reasonable belief that the employer was engaged in unlawful employment practices.'" *Weeks v. Harden Mfg. Corp*., 291 F. 3d 1307, 1311 (11th Cir. 2002) (quoting *Little v. United Tech., Carrier Transicold Div*., 103 F.3d 956, 960 (11th Cir. 1997)).  The Eleventh Circuit has stated:

> It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Little*, 103 F.3d at 960.

The Court has already found that plaintiff was not subjected to a hostile work environment.  A plaintiff, however, in the context of a retaliation claim "need not prove the underlying discriminatory conduct that he [or she] opposed was actually unlawful in order to establish a prima facie case and overcome a motion for summary judgment."  *Id*.[15]  There are

---

[15]"A requirement [that a plaintiff first demonstrate that the conduct is unlawful '[w]ould not only chill the legitimate assertion of employee rights under Title VII but would tend to force employees to file form charges rather than seek conciliation of informal adjustment of grievances.'" *Little*, 103 F.3d at 960 (quoting *Sisas v. City Demonstration Agency*, 588 F. 2d 692,

close cases where a plaintiff's claim for hostile work environment fails but his or her claim for retaliation survives. *See, e.g., Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 769 (2d Cir.1998). This, however, is not one of those cases.

The relevant inquiry for this Court is whether plaintiff's mistaken belief that she was being subjected to a hostile work environment based upon sexual harassment was objectively reasonable. In determining whether plaintiff's mistaken belief was objectively reasonable, the Court considers the substantive law existing at the time. *Clover v. Total System Servs.*, 176 F.3d 1346, 1351 (11th Cir. 1999). The substantive law in place at the time of the alleged harassment was the same as the law discussed above in section II.A.1.

It was clear at the time the harassing conduct took place that Title VII did not enact a "general civility code." *Onacle*, 523 U.S. at 81. Thus, with regard to Eric Soroka's equal opportunity use of foul language, which constitutes a large part of the conduct about which Plaintiff complains, such conduct was not sex-specific, and it was not objectively reasonable for Plaintiff to believe that this conduct constituted sexual harassment capable of creating a hostile work environment.

The Court also finds that it was clear at the time the harassing conduct took place that in order to support a hostile work environment claim the conduct had to be "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment." *Mendoza*, 195 F. 3d at 1245. It was also clear at the relevant time that in order to determine whether harassing conduct meets this standard a number of factors are considered including:"(1) the frequency of the conduct; (2) the severity of the conduct; (3)

_____

695 (9th Cir. 1978)).

whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Id.* at 1246.

Here, it was not objectively reasonable for Plaintiff to believe that the conduct at issue was frequent as only nine sex specific comments were made over two years and eight months.  It was also not objectively reasonable for Plaintiff to regard this conduct as severe given the case law in existence at the time the incidents took place finding more serious conduct was not sufficiently severe.  *See Gupta v. Fla. Bd. of Regents*, 212 F. 3d 571, 584-85 (finding that alleged conduct was not sufficiently severe where over the course of six months a male supervisor frequently called a female professor at home and often asked her personal questions, once complimented her appearance, stared at her twice, once touched her ring and bracelet, repeatedly asked her to lunch, once placed his hand on her knee, and once touched the hem of her dress) (abrogated on other grounds in *Burlington N. & S.F.R. Co. v. White*, 548 U.S. 53, 68 (2006)).  As the Court discussed above, the comments were not physically threatening but were marginally humiliating, and there is no evidence that the conduct at issue unreasonably interefered with Plaintiff's job performance. For these reasons, the Court finds that given the balance of the factors, it was not objectively reasonable for Plaintiff to believe she was being subjected to a hostile work environment based upon sexual harassment.  Thus, Plaintiff's retaliation claim also fails for this reason and the Court grants summary judgment as to Count II on these two alternative grounds.

   B.   **State Law Claims**

In addition, this Court *sua sponte* dismisses Plaintiffs' state law claims.  It is within this Court's discretion to exercise supplemental jurisdiction over pendent state claims.  *Raney v.*

*Allstate Ins. Co.*, 370 F.3d 1086, 1088-89 (11th Cir. 2004).  However, the United States Supreme Court has stated that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).  The United States Supreme Court has since explained that this statement in *Gibbs* is not a mandatory rule, but rather

> [t]he statement simply recognizes that in the usual case in which all federal-law claims are are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine--judicial economy, convenience, fairness, and comity--will point toward declining to exercise jurisdiction over the remaining state-law claims.

*Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7 (1988).  In considering this balance of factors, along with the fact that all federal claims have been dismissed from this action, this Court finds that the balance of factors, including judicial economy, convenience, fairness, and comity, weigh in favor of dismissal.  Therefore, it is hereby:

**ORDERED AND ADJUDGED** that

1.      Defendants the City of Aventura (" the City"), Aventura City of Excellence School ("ACES"), Eric Soroka, and Teresa Soroka's Motion for Summary Judgment (D.E. No. 120) is **GRANTED in part** as to Plaintiff's federal claims in Counts I and II.  A final judgment will be entered by separate order.

2.      The remaining state law claims are **DISMISSED without prejudice** to Plaintiff filing these claims in state court.

3.      This Case is **CLOSED** and all pending motions are **DENIED** as **MOOT**.

DONE AND ORDERED in Chambers at Miami, Florida, this 6 day of May, 2009.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Brown
All Counsel of Record